1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF TEXAS
2            GALVESTON DIVISION

3   WARD ARNOLD            .  C.A. NO. G-13-101
    ANDREA ARNOLD          .  HOUSTON, TEXAS
4                          .
    VS.                    .
5                          .
    FEDERAL NATIONAL MORTGAGE  .  JUNE 6, 2013
6   ASSOCIATION, et al     .  10:10 A.M. to 11:34 A.M.

7

8              TRANSCRIPT of HEARING
       BEFORE THE HONORABLE LYNN N. HUGHES
9           UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  FOR THE PLAINTIFFS:          MR. JEFFREY S. KELLY
                                 The Kelly Legal Group, PLLC
13                               101 Westlake Drive
                                 Suite 300
14                               Austin, Texas   78768-2125

15

16  FOR DEFENDANT FEDERAL NATIONAL
    MORTGAGE ASSOCIATION, BANK of
17  AMERICA, N.A.:               MR. RAYMOND A. CHENAULT
                                 McGlinchey Stafford
18                               1001 McKinney Street
                                 Suite 1500
19                               Houston, Texas   77002

20

21  OFFICIAL COURT REPORTER:     MS. KATHY L. METZGER
                                 U.S. Courthouse
22                               515 Rusk
                                 Room 8004
23                               Houston, Texas   77002
                                 713-250-5208
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

P R O C E E D I N G S

1

2          *THE COURT:*  Thank you.  Please be seated.

3                  Mr. Kelly, when can the Arnolds be out of Fannie

4     Mae's house?

5          *MR. KELLY:*  Your Honor, I'm not able to answer that

6     question, because I am of the opinion that we have a summary

7     judgment and a voluntary --

8          *THE COURT:*  Counsel, you filed a meretricious response

9     to the summary judgment.  You have amended the complaint

10    without leave of Court.  And you have filed a document that

11    says that the Arnolds and you don't think they have a case, and

12    you would like to nonsuit it.  I'll nonsuit it, but it will be

13    with prejudice, because we're too far for you to cut and run

14    and refile it in Dallas or some place.

15                 You cannot -- first of all, your response to the

16    summary judgment, and we can go over it in detail if you would

17    like, but it is simply an empty collection of phrases.  It does

18    not respond to the question.  For instance, you assert that the

19    defendants don't have title.  That will be some surprise to

20    Jerry Fisher, Constable of Precinct 8 of Galveston County, that

21    he's been sued for not having title to any of the interest in

22    this property.

23         *MR. KELLY:*  Well, Your Honor, I think --

24         *THE COURT:*  I don't think Constable Fisher has ever

25    claimed to have an interest in this property, has he?

1        MR. KELLY:  I'm not aware that he's claimed that he

2   has --

3        THE COURT:  And yet you lumped him in with everybody

4   else.

5        MR. KELLY:  I didn't, Your Honor.  Actually that was

6   previous counsel that filed that.

7        THE COURT:  What?

8        MR. KELLY:  Well, Mr. Fisher was nonsuited early on,

9   because of his actions, my clients felt as though he acted

10  wrongfully.  But rather than --

11       THE COURT:  Excuse me?

12       MR. KELLY:  Pardon me?

13       THE COURT:  Who thought Mr. Fisher did anything wrong?

14       MR. KELLY:  My clients.

15       THE COURT:  And what was that?

16       MR. KELLY:  What Mr. Fisher did wrong?

17       THE COURT:  Yes, sir.

18       MR. KELLY:  Was basically what they believe is that he

19  acted on the writ of possession without proper authority to do

20  so.

21       THE COURT:  And what authority did Constable Fisher

22  not have to execute a writ, that writ?

23       MR. KELLY:  Well, if --

24       THE COURT:  Come on.

25       MR. KELLY:  Well, Your Honor, I would like to discuss

that. If we back all the way up to the actual deed of trust --

    *THE COURT:* Counsel, Constable Fisher received from the Court a writ; is that right?

    *MR. KELLY:* That's correct.

    *THE COURT:* What authority did Constable Fisher not have? Your client's belief the writ was improvidently granted is not Constable Fisher's problem. He didn't petition the Court. He didn't decide the case. He didn't even write out the writ. What authority was Constable Fisher devoid of?

    *MR. KELLY:* Your Honor, I can't answer that question.

    *THE COURT:* Yes, you can.

    *MR. KELLY:* No, I can't answer that question.

    *THE COURT:* It was a malicious empty joinder of everybody.

    *MR. KELLY:* No, it wasn't.

    *THE COURT:* The only thing he could have been included for was to enjoin him from executing the writ during the pendency of the suit.

    *MR. KELLY:* He was a necessary party for that, that's correct.

    *THE COURT:* That's not what you said. And it repeatedly just lumps him in with defendants. Didn't have -- in your answer to the summary judgment, the defendants, and all of them don't need that, but since there was no justification for enjoining the execution of the writ, none of the rest of

1  this matters.

2        *MR. KELLY:* Well, Your Honor, we believe that there

3  was --

4        *THE COURT:* No, you don't.

5        *MR. KELLY:* Yes, sir.

6        *THE COURT:* You imagine.

7        *MR. KELLY:* No, I did not imagine.  We have facts.

8  Mr. Olson, Mr. Jeff Olson did an audit on this loan.

9        *THE COURT:* Pardon?

10        *MR. KELLY:* Mr. Jeff Olson out of Chicago did an audit

11  on this loan.  We have good cause to believe that there are --

12        *THE COURT:* You don't.

13        *MR. KELLY:* Your Honor, we do.  And that's from --

14        *THE COURT:* Counsel, you have filed a pleading saying

15  you don't have cause.

16        *MR. KELLY:* Because the only reason we filed that

17  pleading yesterday --

18        *THE COURT:* I don't care why you filed it.  You have

19  made a judicial admission, you don't have good cause.

20        *MR. KELLY:* Your Honor, the reason we filed that

21  pleading yesterday is because for fear of sanctions.  My client

22  didn't want to be subject to sanctions for something that they

23  didn't even have notice to.  Therefore, we decided to

24  nonsuit --

25        *THE COURT:* Didn't have notice to, what does that

1  mean?  There are sanctions that they didn't have notice to?

2  　　　*MR. KELLY:*  Correct, Your Honor.  Your last order said

3  that we are to appear today with regard to answering the

4  summary -- arguing the summary judgment.  Secondly, and for, I

5  believe you said, assessment of sanctions.  We don't have any

6  idea why my clients would be subject to sanctions.

7  　　　*THE COURT:*  Yes, you do.  And besides, wait a minute,

8  they did have notice.  And since you got that order, you have

9  made no effort, there's not a pleading to say would the Court

10  please specify the sanctionable conduct, have you?

11  　　　*MR. KELLY:*  I didn't realize that we were responsible

12  for doing that.

13  　　　*THE COURT:*  Well, I'm sorry, I'm not responsible for

14  what you don't realize.  But you cannot -- let's assume that

15  they did file this.

16  　　　*MR. KELLY:*  Which is what, Your Honor, I'm sorry?

17  　　　*THE COURT:*  This is the confession of a no merit to

18  the lawsuit.  Because one of them had been diagnosed with

19  cancer.  One might want to abandon the lawsuit for that.  But

20  it says and parties and their counsel are responsible for what

21  they file.  This is a judicial admission and --

22  　　　*MR. KELLY:*  Your Honor, when we visited in chambers,

23  you --

24  　　　*THE COURT:*  Wait, wait.  In this amended petition, you

25  seem to have added a couple of parties.  Is that right,

Mr. Chenault?  This Barrett Daffin?

     *MR. CHENAULT:*  Yes, Your Honor, that's foreclosure counsel.

     *THE COURT:*  And Tommy Bastian?

     *MR. CHENAULT:*  That's probably the substitute trustee, but I'm not sure.

     *THE COURT:*  And then, of course, my favorite defendant, the Mortgage Registration System.  At our earlier conference, Mr. Kelly -- and so people who are just reading this part of the record will know, you're the second lawyer, right?

     *MR. KELLY:*  That's correct.

     *THE COURT:*  And why is it that on May 24th, 2013, you would petition for a temporary restraining order?  It's a little late for that, isn't it?  We have you, we have Mr. Chenault, and you have me.  What is the need for temporary restraint?  It would be a preliminary injunction at this stage. Perhaps you ought to read the rules.

     *MR. KELLY:*  I'm very familiar with the rules, Your Honor.  It would be a temporary injunction.

     *THE COURT:*  I don't believe that.  What the order said is if the Arnolds -- that there was an offer by Constable Fisher and the other defendants to give them 30 days to get off of Fannie Mae's property.  And the second paragraph says if they didn't do it by 4:00 p.m., April 23rd and if they

1  continued to pursue their claims and lose, they will likely pay

2  for the bank's cost in defending the lawsuit against them.  The

3  order said it.  So that was signed April 22nd, which gave them

4  until May 23rd.  And then the hearing reference says potential

5  imposition of sanctions.

6            Why did you amend without permission?

7        *MR. KELLY:*  As we discussed in the conference, we felt

8  as though the original petition that was removed from state

9  court was deficient.  We discussed that.  You and I discussed

10  in great detail the additional causes of action that we felt

11  from Mr. Olson's report that were viable causes of action that

12  we had grounds to do.  We did so in the amended complaint.  I

13  did fail to get the Court's permission or opposing counsel's

14  permission.

15        *THE COURT:*  The question was not that you have paid

16  for a delusional report.  But why did you just violate the

17  rule?

18        *MR. KELLY:*  I guess I'm confused about the question.

19  You started by saying that we filed -- we paid for a delusional

20  report.

21        *THE COURT:*  You filed without leave.  That violates

22  the rules.

23        *MR. KELLY:*  And that I apologize for, Your Honor.

24        *THE COURT:*  Well, I don't want you to apologize.  I

25  want you to follow the rules.

1      *MR. KELLY:* Your Honor, the only reason we did that is

2  because of the amount of time. We didn't have enough time

3  between -- because the conference was set.

4      *THE COURT:* I'm sorry.

5      *MR. KELLY:* So, we were at the conference and it was

6  just about a week that --

7      *THE COURT:* I'm sorry.

8      *MR. KELLY:* But, Your Honor, I apologize. I apologize

9  for --

10      *THE COURT:* You didn't have time. You had time.

11      *MR. KELLY:* To motion the Court? To motion the Court

12  to get permission to amend the complaint?

13      *THE COURT:* It's called to move --

14      *MR. KELLY:* I apologize.

15      *THE COURT:* -- for a continuance or for permission.

16  Either of those can be done immediately, can't they?

17      *MR. KELLY:* You can file or move, yes, but by the time

18  you get the decision, today's hearing is upon us, so.

19      *THE COURT:* It could be. It might not be. So, first

20  you're complaining about how swift and just the Court is and

21  then you say but all of a sudden I might turn slothful and not

22  get to it on time.

23      *MR. KELLY:* No, Your Honor, I haven't said that.

24      *THE COURT:* Well, that was the implication, that you

25  would move for a continuance and I would never see it in time.

1  That's not been a problem.

2      MR. KELLY:  I did not mean that to be the implication

3  at all.

4      THE COURT:  Well, I don't care.  Have you favored

5  Mr. Chenault with a copy of Olson's -- is that this person's

6  report?

7      MR. KELLY:  Jeffrey Olson out of Chicago.

8      THE COURT:  Have you favored him with a copy?

9      MR. KELLY:  No, I've not.

10     THE COURT:  Why not?

11     MR. KELLY:  Because I just got the copy last week.

12     THE COURT:  The mail worked all week.

13     MR. KELLY:  Except for Monday, I believe, yes.

14     THE COURT:  Then FedEx it to him or any other reliable

15 system.  I'm not necessarily advertising for Federal Express.

16 You knew it was something you were relying on and the rule says

17 that you're supposed to give that to the other side, doesn't

18 it?

19     MR. KELLY:  Your Honor, that would be fully disclosed

20 in discovery.  He would also be named as an expert.

21     THE COURT:  Counsel, counsel, counsel, it's the

22 predicate for your amended complaint and you owe him a duty of

23 full disclosure.

24     MR. KELLY:  Which I will give him anything he needs.

25 He's --

1          *THE COURT:*  No, you'll give it to him without his

2   asking.  Counsel, this is not a game.

3          *MR. KELLY:*  Your Honor, I don't believe it to be a

4   game.  I think it's a very serious --

5          *THE COURT:*  Rule 26 says that you're to disclose, not

6   sit in Austin and wait for it to be asked for.  Doesn't it?

7          *MR. KELLY:*  Along with a number -- a multiple of other

8   items, yes, it does.

9          *THE COURT:*  And what disclosures have you made to the

10  defendants since you've been counsel?

11         *MR. KELLY:*  No disclosures, Your Honor.

12         *THE COURT:*  Yet another violation of the rule.  Do you

13  have copies of Olson's report there with you?

14         *MR. KELLY:*  I don't, but I have it and I could e-mail

15  it to him or burn it to a CD.

16         *THE COURT:*  You don't have one there?

17         *MR. KELLY:*  I don't, Your Honor.

18         *THE COURT:*  How much did you pay for it?

19         *MR. KELLY:*  I didn't pay for it, Your Honor.  The

20  Arnolds paid for it.

21         *THE COURT:*  Who did?

22         *MR. KELLY:*  The Arnolds, my client.

23         *THE COURT:*  Well, how much did the -- boy, that's a

24  distinction.

25         *MR. KELLY:*  Well, I'm sorry, Your Honor.  It's very

1    important that I answer all of your questions honestly and

2    specifically.

3            *THE COURT:*  It is.

4            *MR. KELLY:*  You asked me how much I paid for it.  I

5    did not pay for it.

6            *THE COURT:*  Well, the full answer is, "The Arnolds

7    paid for it, sir."

8            *MR. KELLY:*  Out of respect for the Court, I want to

9    answer all of your questions specifically.

10           *THE COURT:*  Well, you didn't.

11           *MR. KELLY:*  I'm sorry.

12           *THE COURT:*  If you're going by that truth, whole

13   truth, and nothing but the truth, you missed on the whole

14   truth.  It's like when Mr. Chenault's client BAC Home Loan

15   Servicing, L.P., gets sued and they say in their -- that

16   they're incorporated in Nevada and his answer says, "Denied."

17   And it should say "not Nevada, Minnesota."  That's the whole

18   truth.  That's the answer.

19           The rule says you should admit them, deny them,

20   or say you can't.  It doesn't say you have to only use those

21   three phrases.  And Mr. Chenault would not do that.

22           How much did the Arnolds pay?

23           *MR. KELLY:*  I believe -- again, this is -- I don't

24   know for sure, but I believe it was $1200.

25           *THE COURT:*  And when did the Arnolds get the report?

1      *MR. KELLY:* I have no idea when they got the report.

2  I received it last week. I had a very long conversation with

3  Mr. Olson. He went through the specifics.

4      *THE COURT:* Well, wait. The question is: When did

5  the Arnolds get the report?

6      *MR. KELLY:* I don't know.

7      *THE COURT:* Because you are the Arnolds. It's their

8  case. If the Arnolds don't give you receipts and letters and

9  things that they may have, it's their problem. So, we have

10  what you believe is a critical expert's report on which you

11  relied to unlicensedly amend the complaint, but you haven't --

12  you got it last week. You talked to Mr. Arnold. You haven't

13  furnished it to --

14      *MR. KELLY:* Mr. Olson. I spoke with Mr. Olson.

15      *THE COURT:* Yes, Mr. Olson. The litigation that you

16  mention in Paragraph 18 of this complaint, *Dallas County versus*

17  *MERSCORP, Inc.*, has nothing to do with chains of title. It has

18  to do with an equally idiotic lawsuit by nearly every county in

19  Texas against MERS because it's conceived of avoiding paying

20  filing fees. It has nothing to do with chains of title. It

21  had nothing to do with chains of title. Have you read the

22  complaint?

23      *MR. KELLY:* I have actually read the complaint, Your

24  Honor, yes, I have.

25      *THE COURT:* It's all about some lawyer's

misinterpretation of that statutory section about having to
record changes.

     *MR. KELLY:* Misinterpretation of the property code
statute -- or, I'm sorry, the local government code statute. I
think it's very black and white.

     *THE COURT:* I don't care what you think, counsel. I
have read it. And it doesn't say -- you're ignorance is
versatile. It says if you're going to change something that's
of record, you must file the document in the county where the
original was filed. You cannot file a release of a deed of
trust in Harris County by filing the release in Potter County.
That's half of Amarillo -- or all of Amarillo.

     *MR. KELLY:* Actually it says any assignments,
terminations, releases, et cetera, et cetera, et cetera.
There's a number of items that anything dealing with real
property has to be recorded.

     *THE COURT:* It's not -- no. It says if you're going
to record a change, you have to record it where the original
was. There is no obligation, none whatsoever to the validity
of a deed, a release, an assignment, that it be recorded.
You're an idiot if you don't. I actually had a case where a
company paid a million one for a tract of land out of
bankruptcy. It took it two years to record the deed in
which they only did it after they got sued for possession from
somebody who had another piece of litigation somewhere else.

1   But a deed is effective between the parties when it is
2   delivered.
3           MR. *KELLY:* I agree with that, Your Honor, but it's
4   not effective as against third parties.  It's one of the
5   biggest arguments we have about the deed of trust.
6           THE *COURT:* Your client is not a third party.  They
7   issued the instrument, the deed of trust.
8           MR. *KELLY:* Your Honor, was this assignment recorded?
9           THE *COURT:* What?
10          MR. *KELLY:* Was this assignment recorded?
11          THE *COURT:* It doesn't matter.  Your client is not a
12   third party.
13          MR. *KELLY:* Could I point the Court's attention to the
14   A2 exhibit.  It's the note.  The note doesn't have any
15   allonges.  It's not endorsed or anything.  It's not the note
16   that flowed through.  So, that is one of the reasons that in
17   our response we --
18          THE *COURT:* Counsel, don't shift ground when you can't
19   respond.  Your client is not a third party and has never been a
20   third party.  Your client issued the note and the deed of
21   trust.  The note is negotiable.
22          MR. *KELLY:* That's correct, Your Honor, it is
23   negotiable.
24          THE *COURT:* And it's negotiable in blank.  It's the
25   holder.

1    MR. KELLY:  But it's not stamped.  We don't know who
2 the holder is.  We have no proof in the record of who the
3 holder is.

4    THE COURT:  Wait.

5    MR. KELLY:  That's one of the biggest --

6    THE COURT:  Counsel, stop the song and dance.

7    MR. KELLY:  There's no song and dance, Your Honor.

8    THE COURT:  Yes, it is.

9    MR. KELLY:  It's a very serious matter.  My client --

10    THE COURT:  Counsel, when I say stop the song and
11 dance, say, "yes, sir," or something and don't start a new song
12 and dance.  Your clients have never had two people demand the
13 same month's payment on their note at the same time, have they?

14    MR. KELLY:  Your Honor, I'd ask the Court why the
15 Court believes that to be the case.

16    THE COURT:  What?

17    MR. KELLY:  We have no evidence in front of the Court
18 to do that.

19    THE COURT:  Counsel, your clients know that of their
20 own.  And if two people have demanded the same payment, if the
21 National Bank of San Franscisco and the Seamen's Trust Company
22 of Baltimore had both been sending them demand letters at the
23 same time for the same amount of money, they would have told
24 you that.  And if we don't have evidence, it's because you and
25 they didn't produce it.  That's something uniquely within their

knowledge.  They don't -- in your amended complaint and in the
original complaint, it's never been claimed that they're
confused because they're subject to conflicting claims.  There
are no conflicting claims.  And, so, there's not any doubt.

All right.  Do we have all of the exhibits?

*(Judge conferring with law clerk.)*

THE COURT:  Which one is it you like?

MR. KELLY:  Your Honor, it's not so much one that I
like, rather it's important that the Court pay attention to
what I believe to be what's alleged --

THE COURT:  Oh, stop that.

MR. KELLY:  Well, Your Honor, it's a summary judgment.
I can't affirm that this is the note as it exists today.

THE COURT:  All right.  Well, tell --

MR. KELLY:  What's marked as A1 to defendants' --

THE COURT:  Counsel, tell me your reasonable belief
for this not being the note.  Come on.  You have conferred with
your clients.  You've been able to check the public records.
You have consulted with Mr. Arnold, now Mr. Olson.  And tell me
your reasonable belief for thinking that A1, if I can finally
get to it, is not the note that they issued to the world.

MR. KELLY:  Your Honor, as you're aware, and as the
Court -- I mean, pardon me, as the Court's aware, a note
wouldn't show up in the public record.  So, we can't do a
public records search.

1    THE COURT:  Counsel, I didn't ask you for what you
2  can't do.  I asked you for what note you do know.
3    MR. KELLY:  That is correct, but the Court also made
4  an allegation that we've reviewed the public record.  We have
5  reviewed the public record.  The note doesn't show up there.
6  The reason that we believe --
7    THE COURT:  Counsel, people have -- you can record a
8  note.
9    MR. KELLY:  It's very rarely done, Your Honor.
10    THE COURT:  That's not the point.  If you're worried,
11  you would check.
12    MR. KELLY:  We did check the public record.  There's
13  no --
14    THE COURT:  Well, then it's not recorded.  That
15  doesn't mean this is not -- look, I made a simple statement.
16  You had the opportunity to check the public records, Google,
17  Twitter, all sources of information.  And you have -- and talk
18  to, of course, the Arnolds.
19    MR. KELLY:  And Mr. Olson.
20    THE COURT:  Well, Mr. Olson doesn't know anything.
21    MR. KELLY:  Well, he's actually done an SEC search and
22  he's found that this loan as it stands has been transferred
23  multiple times.  The note as it's presented --
24    THE COURT:  Mr. Kelly, stop that.  I know what these
25  people do, is -- what they do is prepare a long fancy report

1   that verify the notary's commission dates and all kinds of

2   stuff and then they completely misstate Texas law.  And

3   actually it's the restatement about notes and transfers and

4   pools and what is the significance of all these things, and

5   they're just wrong.  If you'll read the deed of trust, which I

6   guarantee you have not done, it says that its benefits inure to

7   the holder of the note.  There's no transfer of the deed of

8   trust necessary.  The transfer of the note carries with it the

9   vendor's lien and the deed of trust lien.

10          *MR. KELLY:*  Your Honor, I've actually read the deed of

11  trust many times.  Therein lies our biggest issue.  If this is

12  truly the note, how did we go from Countrywide in this case to

13  someone now claiming -- you're exactly right, Your Honor.  The

14  deed of trust specifically is an agreement among the parties

15  that says that, hey -- if I may, just please, please, just let

16  me --

17          *THE COURT:*  I know what it is.

18          *MR. KELLY:*  Just please let me make one point.

19          *THE COURT:*  You've made a lot of points.

20          *MR. KELLY:*  Well, I keep getting interrupted, Your

21  Honor, and I can't --

22          *THE COURT:*  Yes, you do, because your points -- I'm

23  not obliged to sit here and listen to you repeat what is a cult

24  of misinformation about notes and deeds of trusts.  My question

25  is:  This is the note.

1    MR. KELLY:  Show me the endorsement, Your Honor, if
2  this is the note --

3    THE COURT:  No, I want you to know that this is the
4  note that the Arnolds issued.

5    MR. KELLY:  That's not -- that is not what my
6  statement was.  If the defendants are coming forth and saying
7  this is the note as it stands --

8    THE COURT:  Counsel, is A1 the note that the Arnolds
9  issued to the world?

10    MR. KELLY:  I believe it to be a copy of the original
11  note that was signed, yes.

12    THE COURT:  Okay.  And at about a third of the way up
13  from the bottom of page 3, what's that?

14    MR. KELLY:  It's an endorsement in blank.  So, we have
15  no idea who holds this note.

16    THE COURT:  Ignorance is not a defense.

17    MR. KELLY:  I'm not --

18    THE COURT:  Ignorance -- that wasn't the question.
19  Ignorance is not a defense.

20    MR. KELLY:  Correct.  And that's the one of the
21  reasons why we're asking the defendants to prove who holds the
22  note.

23    THE COURT:  No.

24    MR. KELLY:  If they're trying to --

25    THE COURT:  Wait.  Wait.  I'm going to do this on the

papers, if you will not limit yourself to the point under
discussion briefly and not simply repeat your slogans.  Now,
are you going to act like a lawyer or are you going to act like
a used car salesman?

   *MR. KELLY:*  It's my belief that I'm acting as a very
good lawyer, Judge, this morning.

   *THE COURT:*  You're wrong.  You're trying to obscure
things and waste everybody's time.

   *MR. KELLY:*  I'm not trying to waste anyone's time,
Your Honor.  I'm just trying to --

   *THE COURT:*  Well, you're doing and awfully good job of
it.

   *MR. KELLY:*  I'm just trying to advocate the best I can
for my client.

   *THE COURT:*  Based on a reasonable investigation of the
facts and the law.

   *MR. KELLY:*  That's correct.

   *THE COURT:*  Now, tell me what Mr. Olson knows about
Texas law.

   *MR. KELLY:*  I can't speak to what our expert is --

   *THE COURT:*  Stop.  That's all I want to know.  You
have no idea.  And what is his other background that makes him
qualified to be an expert?

   *MR. KELLY:*  He's been doing this for many, many years.
He's very familiar with the UCC and very familiar with the SEC

1  requirements, that these notes are specifically traced through
2  the system.

3          THE COURT:  What, the SEC?

4          MR. KELLY:  Securities and Exchange Commission.

5          THE COURT:  I just wanted to make sure you're talking
6  about the wrong entity.  All right.  The Securities and
7  Exchange Commission has the ability to tell people how they may
8  publicly market securities.  It says nothing about the validity
9  of a note or a transfer.

10         MR. KELLY:  Well, the pooling and servicing agreements
11 from the defendants are recorded in the SEC as public record.

12         THE COURT:  Yes, because there's some interest in the
13 pool on the open market.  That's the SEC's jurisdiction.  And
14 your guy has apparently read the pooling agreement.  And if
15 he's no different from the rest -- well, if he makes the claim
16 that the pooling agreement has any effect at all, he hasn't
17 read it carefully.

18              Now, we have a note endorsed in blank.  So,
19 there's nothing wrong with the note, is there?

20         MR. KELLY:  I don't know how to answer that question,
21 because if I answer it the way I want to answer it, I believe
22 the Court will think I'm playing games.  I don't know if
23 there's anything wrong with this note.  The reason that we're
24 making an issue --

25         THE COURT:  Counsel, you're making up facts that you

hope exist.  One of the defendants has produced this note and on its face it appears regular and you have no document to the contrary to offer in response to the summary judgment that would question the validity of this note.

　　　　*MR. KELLY:*  We have not objected to this as evidence, that's correct.

　　　　*THE COURT:*  So, this is it.

　　　　*MR. KELLY:*  But the fact that's in dispute today is who holds this note.  It's endorsed in blank.

　　　　*THE COURT:*  Okay.  I know it's endorsed.  See, you repeat the obvious.  As I pointed out, it was endorsed in blank to make sure I had you committed to that, because you were muttering things about allonges missing and things.  So, the question that bothers you is you don't know who holds it.  Right?

　　　　*MR. KELLY:*  That's correct.

　　　　*THE COURT:*  Okay.  And, Mr. Chenault, I've got to give you something to do.  Well, he's not going to talk for long.  He never does.  When was the last time the Arnolds paid an installment on the mortgage?  I know it's all in there, but I just -- well, they defaulted in October 1st of 2011, that's what I have in my notes.

　　　　*MR. CHENAULT:*  I don't believe they have paid for approximately 18 months now.

　　　　*THE COURT:*  Pardon?

1      MR. CHENAULT:  I think it's been about 18 months since
2  they've made a payment.
3      THE COURT:  In 18 months -- well, from December of
4  2005 when the Arnolds issued this note to Countrywide and
5  Countrywide requested payments; is that correct, Mr. Kelly?
6      MR. KELLY:  I don't have any other evidence to the
7  contrary.
8      THE COURT:  The Arnolds don't know anything to the
9  contrary.  Then the Arnolds quit paying Countrywide in October
10  of 2011.  And sometime around February or March of 2012, the
11  Arnolds started getting demands and letters and other strange
12  correspondence from computers at Bank of America.  Is that
13  about right?
14          And did Mr. Olson or you read the papers in '11
15  and '12 or go online or go to the SEC or the FDIC or the -- I
16  don't even know what they call the office of thrift
17  supervision, on any of those institutional Web sites or just
18  Google Countrywide, Bank of America?
19      MR. KELLY:  During that time when they were receiving
20  those letters?
21      THE COURT:  Any time.
22      MR. KELLY:  I'm quite sure my clients did during those
23  times and, yes --
24      THE COURT:  Well, what about you?  Recently?
25      MR. KELLY:  Yes.

1          THE COURT:  Mr. Olson?

2          MR. KELLY:  Again, I can't speak to what he's done as

3    an expert.

4          THE COURT:  Well, is it in his report?

5          MR. KELLY:  References to specific letters?

6          THE COURT:  No.  References to anything that might

7    have happened with Countrywide and Bank of America in that

8    time.

9          MR. KELLY:  Yes.

10          THE COURT:  And what was that?

11          MR. KELLY:  Well, I believe, to be fairly common

12    knowledge, that Countrywide basically went under.  Bank of

13    America bought the assets, meaning the notes.

14          THE COURT:  Well, I don't know that it was an asset

15    purchase or a stock purchase.

16          MR. CHENAULT:  It was an acquisition.

17          THE COURT:  The whole company?

18          MR. CHENAULT:  The whole company.

19          THE COURT:  Whole company.  And then here we are with

20    Bank of America demanding payment, right?

21          MR. KELLY:  Correct.

22          THE COURT:  So, Countrywide is still demanding

23    payment.  How can you be confused about the holder when the

24    Arnolds issued a note to Countrywide and Countrywide changed

25    its name to Bank of America and Bank of America asked for

payments and asked and asked?  At no point did the Arnolds
write Bank of America and say, "We're confused.  We're getting
demands from Countrywide and you," although with some of Bank
of America's paperwork, that could have happened.  But they
haven't told you that they're -- the Gambino family in New York
and Bank of America are both demanding payments on the loan,
have they?

     *MR. KELLY:*  They have not told me that.

     *THE COURT:*  And the person who makes the demand here
and the person who foreclosed and all those things is the very
same person that lent the Arnolds the money?

     *MR. KELLY:*  (Shaking head.)

     *THE COURT:*  Why are you shaking your head?

     *MR. KELLY:*  That's not the case.  Countrywide lent the
money.  Countrywide was the payee of the note.

     *THE COURT:*  Countrywide is Bank of America.

     *MR. KELLY:*  Then why doesn't Bank of America -- excuse
me.  I'll retract that statement.

     *THE COURT:*  I just spent seven or eight minutes going
through the fact that the reason there's nothing else on the
note and the reason that there's no confusion on the Arnolds'
part is the note hadn't gone anywhere.  Countrywide just
changed its name.  And what was Mr. Arnold's education?

     *MR. KELLY:*  He's a real estate -- I don't know his
full --

1  *THE COURT:*  He's a real estate broker.

2  *MR. KELLY:*  Yeah.

3  *THE COURT:*  So, he probably knows about problems in

4  Countrywide mortgages.  And, also, it's -- the loan was bought

5  for $230,000 and the appraisal currently is 300,000.  So, we're

6  not talking about a migrant farmworker from Belgium who is

7  being oppressed and living in a shack out on the bypass, are

8  we?

9  *MR. KELLY:*  We're not.

10  *THE COURT:*  So, since the holder is the original

11  payee, there can't be any argument about all this other stuff.

12  There's no confusion.  There's no who holds the note.

13  Mr. Olson has told you a lot of things about mortgage pools and

14  MERS and stuff.  MERS is a tracking system that's for the

15  efficiency of transferring mortgages.  They would have their

16  own index numbers and that lowers the cost of mortgage lending,

17  which lowers the cost of mortgages to consumers and it's a

18  wonderful thing.  It doesn't do anything except sort of keep

19  track.

20  *MR. KELLY:*  Correct.  But in this case they tried to

21  assign the deed of trust.  They can't do that.  They're only a

22  registration agency.  They've admitted that in the bankruptcy

23  transcripts.  They are not -- they are not and they do not have

24  the ability to transfer the deed of trust.  That's what they've

25  done here.

1        *THE COURT:*  No.

2        *MR. KELLY:*  Yes.

3        *THE COURT:*  If they did, they transferred something to

4 which they didn't have title.  So, it's ineffectual anyway.

5        *MR. CHENAULT:*  Yes, Your Honor.  I believe the deed of

6 trust contains some provisions where --

7        *THE COURT REPORTER:*  Can he speak into the mike?

8        *THE COURT:*  Speak up or talk into the microphone.

9        *MR. CHENAULT:*  I'm sorry.  I believe the deed of trust

10 that the Arnolds executed contains a provision that identifies

11 MERS as the beneficiary and gives them -- acknowledges that

12 MERS has the right to transfer, assign, or even foreclose.

13        *MR. KELLY:*  Being well-versed in reading a deed of

14 trust very many times, I can say that in the first paragraph,

15 it recites them as the nominee, but then MERS is now trying to

16 assign the deed of trust.  They can't do that.  They're only a

17 tracking system.  They don't hold title to or the ability to

18 transfer the deed of trust.

19        *THE COURT:*  Well, I mean, you can sell your car to

20 MERS if you want to.

21        *MR. KELLY:*  Pardon me, Your Honor?

22        *THE COURT:*  You can sell your car to MERS.  They can

23 take title to stuff.

24        *MR. KELLY:*  It can't.  It's only a registration

25 system.  It's been --

1     *THE COURT:*  It buys computers.  It hires people.  It
2  has desks.  I bet you it has company cars.  What do you think?
3     *MR. KELLY:*  Your Honor, I can't answer that question,
4  but it's been very well --
5     *THE COURT:*  Think.
6     *MR. KELLY:*  I can't say that they have company cars.
7  I know they have computers because they spit these assignments
8  out.  They can --
9     *THE COURT:*  Well, they may only have a computer
10 service.
11    *MR. KELLY:*  That's true.
12    *THE COURT:*  Make them a good deal and see if they'll
13 buy you a car.  Why didn't Ms. Arnold join into all of --
14    *MR. KELLY:*  Pardon me, Your Honor?
15    *THE COURT:*  Well, it's all pro forma by her.  She --
16 he signed the note.  She didn't.  And then all the security is
17 pro forma -- I mean, I know technically why they insisted she
18 do that is so she didn't claim any homestead interest in it and
19 that sort of thing.  But why didn't she jump in there and
20 participate in the note, too?
21    *MR. KELLY:*  I don't know.  It could be for credit
22 reasons.  It could be for a number of issues.
23    *THE COURT:*  Well, what the deed of trust clearly
24 says -- that you've read carefully, right?  That's what you
25 told me earlier.

1      MR. KELLY: Right.

2      THE COURT: Okay. Well, all the way on page 2, it

3 says MERS is an agent of the holder.

4      MR. KELLY: And Paragraph E of the --

5      THE COURT: I know where it is. I just read it from

6 there.

7      MR. KELLY: I'm sorry. I apologize.

8      THE COURT: It's an agent. It's a flunky. The holder

9 is the organ grinder. MERS is the monkey.

10      MR. KELLY: Correct. Paragraph E says that it's the

11 nominee to the lender.

12      THE COURT: They've got the authority to do whatever

13 the holder tells them to do in that situation. Whether the

14 agent of the lender is MERS or a deputy vice president in the

15 Minot, South Dakota branch of Bank of America, but Bank of

16 America works through agents.

17      MR. KELLY: In this case MERS, I believe, alleges that

18 they were acting as an agent for Countrywide.

19      THE COURT: But Countrywide is Bank of America. Stop

20 that.

21      MR. KELLY: Yes, sir.

22      THE COURT: Your arguments are not circular. They're

23 spiral and spiral downwards. You keep coming back to the same

24 thing after we've exhaustively discussed it.

25           The deed of trust lien was foreclosed by the

1  trustee at the request of the initial payee of the note.  By

2  your clients' logic, if you issued a note to Mildred Johnson

3  and she marries Ralph Ferguson, that she can't hold the note

4  anymore.  She doesn't have to endorse it to herself.  Does she?

5  Besides it's already endorsed in blank, so it doesn't matter

6  who, but it happens to be endorsed in blank and still held by

7  the original payee.

8           And in your proposed amended petition, Mr. Kelly,

9  you actually name Bank of America as successor by merger to

10  Countrywide with the payee named the party, clearing up a whole

11  lot of confusion for us.

12           *MR. KELLY:*  The only reason we named it that way is

13  because that's the way it's been presented.

14           *THE COURT:*  I don't care why you did it.  You sued

15  them that way.

16           *MR. KELLY:*  Well, but it's -- no, it's not a judicial

17  admission that we say that Bank of America holds the note or

18  anything.  It's just that that's the way that they've

19  created --

20           *THE COURT:*  You have pleaded -- you have pleaded that

21  Bank of America is the successor by merger to Countrywide.

22  Countrywide is the payee.  Ipso facto, to lapse into Latin as I

23  like to do every once in a while, Bank of America holds the

24  note.

25           If title to the note was transferred to a

1   mortgage pool, the deed of trust would automatically follow

2   title to the note.  Right?

3        *MR. KELLY:*  If that's the case, then why was the

4   assignment done?

5        *THE COURT:*  What?

6        *MR. KELLY:*  If that's the case, then why was the

7   assignment done in 2012?  If it went into the mortgage --

8        *THE COURT:*  You know, if there's belts and suspenders

9   doesn't mean that they're naked.  Just because they overdid

10  it -- and mainly I suspect they're recording changes simply for

11  the fact that they're trying to prevent this sort of nonsense,

12  running up their transaction costs.  Now, I don't know how this

13  mortgage pool, if there was one, worked.  But lots of mortgage

14  pools, what is assigned is the income and not title to the

15  note.  And so that would mean that Bank of America is still the

16  holder of the note.  They've just told their brother-in-law

17  that you can have the 84 percent of the gross interest income

18  because they have a contractual commitment to assign the income

19  stream from enough producing mortgages to keep the mortgage --

20  the pool balance at a certain level.  It's all very clever,

21  invented by the Dutch in about 1620.  It's nothing new.  It's

22  nothing controversial.  It's certainly nothing evil and it's

23  not illegal.

24            All right.  The lender does not have a fiduciary

25  duty to your clients.  They're adversaries.  The borrower and

1  the lender do not have a fiduciary relationship.  If the lender

2  takes security, they have a bailee's ordinary responsibility

3  for the care of the security.  But that's not a problem here,

4  because there was a trustee and an instrument signed by your

5  clients that defined the handling of the security.  We have a

6  very long show me the note provision.  The bank does not have

7  to join Arnold's wife in the eviction.  They just have to

8  assert the title that is antecedent to hers.  Well, you say

9  eviction.  They're still in the house, right?

10       *MR. KELLY:*  Correct, Your Honor.

11       *THE COURT:*  And they haven't paid the taxes or

12  insurance on the house since October 1 of 2011, right?

13       *MR. KELLY:*  When I asked after our conference, when I

14  asked that, they said that they had not for fear of the

15  unknown, not knowing how this was going to turn out.  They

16  didn't know what to do with it.

17       *THE COURT:*  What?

18       *MR. KELLY:*  They had no problems with paying it.  They

19  just didn't know who to pay it to.

20       *THE COURT:*  You pay insurance to the insurance

21  company, and you pay the taxes to whoever sends you the opaque

22  little bills.  Those are current operating costs.  Those are

23  not loan costs.  They're not capital costs.  They are current

24  operating costs.  Did your clients pay their electrical bill?

25       *MR. KELLY:*  I would have to assume that they did.

1   *THE COURT:* Oh, you would. They make the taxing

2 authorities look lax, and the water bill, not to mention the

3 cable bill and a bunch of other stuff. So, they didn't even

4 pay the operating costs but allowed Bank of America to pay them

5 for them. So, at a minimum the Bank of America would have been

6 owed all that stuff that it advanced your clients. And there

7 is an independent obligation in the deed of trust to do both

8 those things, on your clients, to ensure and to pay the taxes.

9 Did you read that part?

10   *MR. KELLY:* I did, Your Honor.

11   *THE COURT:* I don't see it. She signed the deed of

12 trust, didn't she?

13   *MR. CHENAULT:* I believe she did pro forma.

14   *THE COURT:* Well, but she has no independent

15 interests. She --

16   *MR. CHENAULT:* We would only have recourse against

17 him, because he's one that signed the note.

18   *THE COURT:* Well, but I can pledge my house to his

19 house's mortgage, can't I?

20   *MR. CHENAULT:* I wouldn't know if --

21   *THE COURT:* I'm not about to. I just want to make

22 that clear. But you take collateral security all the time.

23   *MR. CHENAULT:* We do.

24   *THE COURT:* The house is direct security, but people

25 take all kinds of --

1          MR. CHENAULT:  Part of the reason for requiring the

2    signature on the deed of trust is for these kinds of

3    situations.

4          THE COURT:  But she subordinated her title to the deed

5    of trust lien.  And is the deed to him?

6          MR. CHENAULT:  Yes.

7          THE COURT:  You shouldn't have to -- just move it

8    closer to you.

9          MR. CHENAULT:  Yes, the deed is to Ward Arnold I

10   believe is his first name.

11         THE COURT:  Okay.  So, the loan was foreclosed against

12   him?

13         MR. CHENAULT:  Yes.

14         THE COURT:  But to the extent she has any interest,

15   she subordinated it to the deed of trust lien?

16         MR. CHENAULT:  That's correct, Your Honor.

17         THE COURT:  And, of course, her interests would be

18   entirely derivative of Ward's in the vendor's lien in the deed

19   to him.

20         MR. CHENAULT:  That's right, Your Honor.

21         THE COURT:  All right.  On the date of foreclosure,

22   December 4th, 2012, the Arnolds had not paid for over a year.

23   What's wrongful about the foreclosure?

24         MR. KELLY:  Well, a number of things.  The deed of

25   trust --

1          *THE COURT:*  Well, if they all go back to that -- if
2    they all go back to the -- these arguments about separation and
3    recordation, we've covered those.  But in the foreclosure
4    itself, what was wrongful?
5          *MR. KELLY:*  It's our belief that the errors that
6    occurred with the deed of trust are as well errors that caused
7    problems with the deed of trust, we believe.
8          *THE COURT:*  I said besides that.
9          *MR. KELLY:*  Exactly.  So, we briefed those.  We'll
10   stand on our brief.  No further comments on that.
11         *THE COURT:*  Breach of contract for not recording.  The
12   note is a contract full and itself, whether it is ever recorded
13   or the benefits of it are sold to somebody else.  And
14   technically it's not a contract.  It's a species of a
15   consensual agreement.  It's a grant.  It's an unconditional
16   promise to pay by your client.  And, so, contracts don't have
17   to be recorded.  They may, but they don't have to be.
18   Promissory notes don't have to be recorded.  They may be, but
19   they don't have to be.  But failure to record an instrument
20   issued by your clients is not a breach of anything.  They're
21   not obliged to record it for their benefit.  They would only
22   record it for their own benefit.
23              And what contract did anybody in this interfere
24   with tortiously?
25         *MR. KELLY:*  For fear of frustrating the Court, I'll

stand on our brief as well.  Most of these issues were detailed
in our brief and they're --

  *THE COURT:*  In other words, there isn't a contract
that you can identify.  There's only -- the note's not a
contract.  The deed of trust is not a contract.  The deed with
the vendor's lien is not a contract.  Your clients' failure to
pay the mortgage is not a contract.

  *MR. KELLY:*  It's our belief that the deed of trust is
a contract.  It's a bilateral agreement between the parties.
It requires a trustee doing certain things.

  *THE COURT:*  There's a reason that we have labels for
things.  Like I get real property leases that say "lease
agreement contract."  And if they're really good draftsmen,
they say "mutual lease agreement contract."

  *MR. KELLY:*  Isn't that redundant?

  *THE COURT:*  It's redundant about six different ways.
A lease is a bilateral consensual agreement, the transfer of
occupancy without title to real property.  That's what the word
means.  A deed of trust is just what it says.  It's a deed,
which like a contract is a commitment in trust and then the
conditions of the trust are in there.  It's no different than
an oil and gas lease is actually not a lease.  You can call it
that to throw the Iraqi terrorists off.  It's a grant with the
mineral fee on a condition subsequent to failure to produce or
keep the half-million-dollar lending fee on the condition of

```
 1  production.  Bankruptcy courts in this building treat oil and
 2  gas leases as if they are leases.  And they are in Kansas.  So,
 3  you've got to be very careful about that.
 4            All right.  And I took that from the unpermitted
 5  amended complaint.  All right.  Yes, sir.
 6       MR. CHENAULT:  If the Court is still considering the
 7  voluntary dismissal even with prejudice --
 8       THE COURT:  I'm not.
 9       MR. CHENAULT:  All right.
10       THE COURT:  I'm going to enter a judgment with title
11  and possession.
12            Out of a perhaps perverse curiosity, I would like
13  to see Mr. Olson's report, but I want him to have one.  So,
14  unless somebody objects to my -- I don't necessarily want to
15  put it in the record.  You can if you want to, but I would like
16  to just look at it.  I've seen 123,496 of them.  I just --
17       MR. CHENAULT:  I've seen a number of them, too, Your
18  Honor, and I've yet to see one that didn't have a disclaimer
19  that it was not an opinion.
20       THE COURT:  Oh, usually there's a page, I'm not a
21  lawyer, not an accountant, not a securities analyst, but I am a
22  certified securitization analyst.  And that could be true.
23  That part could be true, but that's about the point, since it's
24  a title they make up, that you leave.  Do you go on that
25  bankruptcy lawyer in Ohio's Web site, a baker's dozen of
```

 1  reasons not to pay your mortgage?  And they list all these

 2  things.  I hope he makes more money off his Web site than he

 3  does practicing law like that.

 4              So, we're back to my original question.  When can

 5  they be out?

 6          MR. KELLY:  Can I ask the Court for a month?

 7          MR. CHENAULT:  We would probably be amenable to a

 8  month.  Our clients are a little upset that they had to go

 9  through all this briefing.

10          THE COURT:  Well, I haven't gotten to the sanctions

11  part.

12          MR. CHENAULT:  But 30 days would be acceptable.

13          THE COURT:  All right.  Today is the anniversary of

14  the liberation -- the start of the liberation of Europe.

15          MR. CHENAULT:  D day.

16          THE COURT:  More people landed in 24 hours on June 6th

17  at Normandy than were in the United States Army on

18  September 1st, 1939, when the war broke out.  And there were a

19  lot of other things going on at the same time, but just that's

20  one of those facts that puts into perspective how unprepared we

21  were.

22              Well, 30 days is July 4th.  So, we'll move it up

23  to July 3rd.  Now, Mr. Kelly, I do not know the Arnolds, but I

24  will retain jurisdiction of this until they are gone.  And

25  should they take things from the house to which they do not

1   have title, fixtures, if there's any defacing or to be trendy,

2   trashing of the house, killing plants, I mean, any of that,

3   they will answer to me.

4         *MR. KELLY:* I will convey that message to them, Your

5   Honor.

6         *THE COURT:* Make it perfectly clear. Since the Kellys

7   have been living in a 300,000-dollar house for a couple of

8   years, paying no mortgage --

9         *MR. KELLY:* Your Honor, my name is Mr. Kelly.

10        *THE COURT:* I'm sorry. The Arnolds have been living

11   in a 300,000-dollar house -- you've probably got one of those

12   Austin mansions. I've read about what goes on in Austin. For

13   over two years not paying a cent on their mortgage, not paying

14   taxes or insurance on the house, they certainly have some

15   disposable income. So, Mr. Chenault, can you estimate a

16   reasonable fee for having to go through this?

17        *MR. CHENAULT:* I would estimate it at $7,500.

18        *THE COURT:* Does that sound reasonable, Mr. Kelly?

19        *MR. KELLY:* No, not whatsoever, Your Honor.

20        *THE COURT:* Pardon?

21        *MR. KELLY:* No, not whatsoever, I don't think.

22        *THE COURT:* What is reasonable?

23        *MR. KELLY:* Well, for one, the implications of

24   sanctions we don't believe are -- is relevant or --

25        *THE COURT:* Excuse me, counsel. I asked you for a

quantum that's a reasonable cost for the people who are kind
enough to lend your clients money eight years ago, to have gone
through this last spasm, including addressing the unpermitted
amended complaint and frankly the whole case. But what is a
reasonable fee?

    *MR. KELLY:* Well, knowing opposing counsel's
expertise, I would say he's probably billing out at 300 an
hour.

    *MR. CHENAULT:* Approximately.

    *MR. KELLY:* And giving him the benefit of doubt of ten
hours, I would say that this shouldn't exceed $3,000.

    *THE COURT:* And they paid $1400 for Olson's report.
They paid that much to get the information that presumably was
given to the first lawyer. They were offered a chance then to
stop it after a full explanation at least as long as this, the
first round. When they refused, the lawyer declined to
represent them further. They hired you. They paid Mr. Olson.
I don't know when that happened, but I think it happened early
on, because in real estate circles, they know these things. It
has been protracted since whenever the first thing was filed,
which I've now buried 43 times. Do you know when they first
sued in state court?

    *MR. KELLY:* It was removed here.

    *MR. CHENAULT:* I thought it was in --

    *THE COURT:* I know I've got it -- well, here it is.

1        MR. CHENAULT:  If it helps the Court, the reason I say

2   7,500, in this particular instance, we agreed to a defense for

3   a flat fee of $7,500.  So, it's not just simply total of hours

4   for this.  It's just what it cost our client to defend.

5        THE COURT:  And there all kinds of hours of actually

6   reading all of this stuff.  Even though they are largely

7   repetitive, there are wrinkles.  But this was filed in

8   Galveston County with a stamp that apparently the County bought

9   in 1924, on March 18th.  Is that about right?

10        MR. CHENAULT:  I think so.  It's a relatively new

11  suit.  And, frankly, we didn't expect it to be anything,

12  because we have a plaintiff that was knowledgeable in real

13  estate and we didn't expect that we would have to litigate it

14  as vigorously as we have.

15        THE COURT:  All right.  I really appreciate you,

16  Mr. Chenault, because you either mumble almost as bad as I do

17  or speak softly, whichever the case is, so the court reporter

18  won't think I'm the only bad person around.

19             I think $7,500 in the Houston market for taking

20  on the responsibility of what is a three or $400,000 asset,

21  because if the Arnolds succeeded on any of their claims, like

22  tortious interference, there are all kinds of soft damages.

23  Could even be soft damages in a wrongful -- I mean, breach of

24  fiduciary duty, but not normally.  But in the amended complaint

25  there are eight legal theories.  And as misguided as they are,

they still require a defense counsel to carefully read them and
to carefully check the facts that might apply to them.  So, I
think $7,500 is reasonable.  And you've noticed in your brief
experience with Mr. Chenault, he did not do what some defense
lawyers do, which is make it worse rather than better by filing
a bunch of other stuff.  He quietly, too quietly for the
reporter, methodically goes about his business and burdens the
Court, the plaintiffs, and his client as little as possible.
And the fee is joint and several with you and both Arnolds.

     *MR. KELLY:*  I would ask the Court to reconsider that.
I don't know that I was responsible for any of the $7,500.

     *THE COURT:*  We had a conference.  We covered all of
this at the conference, which was the same matter we covered
before.  The transcript of that was available.  You reinvented
the entire case and required his additional briefing and his
motion for summary judgment to be more extensive than it
otherwise would have been and this was after, of course, there
was an offer that was recommended by earlier counsel to quietly
quit the premises two months ago.  But your clients persisted
in their suit, which they couldn't have done without you.  Why
shouldn't you pay your share?

     *MR. KELLY:*  There's a substantial amount of case law
that specifically is on point with regard to attorneys and
whether or not they're liable for attorney's fees or damages in
this case when pursuing their client's interests.  For

instance, Barrett Daffin is at the front -- the forefront of
this and every time there's a motion, they automatically plead
that there's no liability whatsoever. They're in litigation
and -- well, I can provide a brief for the Court, but --

     *THE COURT:* Wait a minute. What are you talking
about?

     *MR. KELLY:* Your Honor --

     *THE COURT:* I'm talking about your actual behavior on
two occasions in person and several occasions in writing, which
pursue claims that had already been fully addressed in an
earlier hearing with an earlier lawyer, and nothing has changed
except the volume of talk and the volume of paper. I even
explained to your clients that this was a likelihood. But
there is no misunderstanding. This is not one of those cases
where the note's been through 43 hands. But despite, I don't
know, seven or 800 of these cases, I've never had a case with
dual demands. Every case I have that people have dealt with
it, they have never raised the question of, gee, you've been
sending me demands and everything for a year. Are you really
the holder of the note? They've never written the lender and
said, "I don't understand." Only after they fall into the
clutches of an Olson or whatever that guy in Ohio's name is,
they spend too much time on Google or they hire a lawyer who
will persist in these claims, do they decide that they were
confused.

1          There is no evidence, none, that your clients

2   have offered that they were confused.  They have claimed

3   confusion.  But there is nothing that they have produced that

4   would suggest a plausible basis for them having a

5   misunderstanding about with whom they were dealing and why.  A

6   claim of confusion is not evidence of confusion.  But in this

7   case it's as simple and direct as it could be.  Countrywide

8   lent them $300,000.  It became the Bank of America.  And they

9   didn't pay for two years.  They didn't pay anything.  And they

10  haven't saved the money to bring it current.

11         Sometimes I've had people who there's a real

12  dispute about something and they opened a savings account and

13  put their -- what they thought the right monthly payment was

14  into the savings account every month.  So when they came to see

15  me, they said, "Here's what I think I owe," and they want to

16  explain to me why that's off.  Those cases are a consequence of

17  poor computers, which means poor leadership in the lenders or

18  holders.  There are all kinds.  I had a case where the nice

19  couple, they said they fell behind.  They had a contract in

20  escrow with an earnest money deposit for enough money to pay

21  off the lender and they got $30,000 of equity.  And once the

22  lender found that out, the case went away.  And they didn't

23  know what else to do but sue.  And that's -- and they did it

24  themselves actually.  And they had facts on their side.  Don't

25  foreclose.  We've got a third party sale.

1          I've had other cases where they keep getting
2    temporary restraining orders based on a sale, all of which are
3    to somebody whose address they don't know and there's no
4    earnest money and other things like that.
5          Your clients had zero evidence of anything, other
6    than for some reason they may have inadvertently fallen behind,
7    but Countrywide did not adopt your clients.  They lent them a
8    whole bunch of -- a third of a million dollars, roughly, to
9    enable them to live in a house that they chose.  They chose the
10   interest rate.  They chose the amount of principal.  They chose
11   the neighborhood.  Didn't they?
12        *MR. KELLY:*  One would assume.
13        *THE COURT:*  Yeah.  In writing, we saw them do it.  So,
14   all that was required was they pay for it.  They can't or
15   won't.  They lose.  Anything else?
16        *MR. KELLY:*  I just ask the Court to reconsider the
17   joint and several aspects of the sanctions.
18        *THE COURT:*  I have.  The answer is it's joint and
19   several.  Your clients have the money.  They've got 26 months
20   of unpaid mortgage payments.  That's more than enough to pay
21   this.  But you cannot run up somebody's costs and then say it's
22   all my client's fault.  It takes both of you.
23        *MR. KELLY:*  Your Honor, we were pursuing what we
24   thought were meritorious claims.  That's all we were doing.
25        *THE COURT:*  Your thought level is not the standard for

1   proper practice of law.  You did not make your disclosures.

2   You did not investigate the facts.  You assert they're

3   confused, but you have no fact that would justify that

4   assertion.  All you have is after the first conference, you

5   read Olson's report.  All you have is an unqualified person

6   drafting a report that is much like internal personnel

7   memoranda in the government, which is all blather and no

8   substance.  You can rely on tea leaves for all I care, but

9   you'll take the consequences.  This is not a game.

10          *MR. KELLY:*  I didn't say it's a game.

11          *THE COURT:*  Litigation is not a piñata that you get to

12  whack at it with a stick until something falls out from the

13  other side.  You cannot do it.

14              All right.  Anything else?

15          *MR. CHENAULT:*  No, Your Honor.

16          *THE COURT:*  All right.  I'll circulate a draft of the

17  order just to make sure the legal descriptions and everything

18  are right.

19          *MR. KELLY:*  And there will be a final judgment,

20  correct?

21          *THE COURT:*  It will be a final judgment.

22          *MR. KELLY:*  Okay.

23          *MR. CHENAULT:*  Thank you, Your Honor.

24      *(Concluded at 11:34 a.m.)*

25                      *  *  *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled cause, to the best of my ability.

/s/ *Kathy L. Metzger*                                        9-17-2013
Kathy L. Metzger                                        Date
Official Court Reporter